Cite as 2019 Ark. App. 397

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-19-126

| | |
|---|---|
| | **Opinion Delivered:** September 18, 2019 |
| AMBER BOOMHOWER AND MARK HOSIER | |
| APPELLANTS | APPEAL FROM THE GREENE COUNTY CIRCUIT COURT [NO. 28JV-17-120] |
| V. | |
| | HONORABLE BARBARA HALSEY, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | |
| | AFFIRMED |
| APPELLEES | |

## MIKE MURPHY, Judge

Appellants Amber Boomhower and Mark Hosier appeal from the November 14, 2018 order of the Greene County Circuit Court terminating their parental rights to their children. Both Boomhower and Hosier challenge the circuit court's findings on statutory grounds for termination and best interest. We find no error and affirm.

I. *Procedural Facts and History*

Boomhower is the mother of WH (born 11/13/2006), LJ (born 8/10/2008), and MH (born 1/23/2015). Hosier is the legal father of MH and legal custodian of WH. LJ's legal father is not a party to this appeal. Boomhower and Hosier have a history of involvement with the Arkansas Department of Human Services (Department) dating back to April 9, 2013. In 2014, WH and MH spent three months in foster care, and the Department provided the family with various services including cleaning and teaching the

parents how to clean. In September 2016, there was a true finding of environmental neglect. When the Department filed its petition for emergency custody, a protective-services case had been open since November 16, 2016, due to environmental neglect.

On April 7, 2017, the Department exercised an emergency hold on the juveniles and filed a petition for emergency custody and dependency-neglect five days later. In the attached affidavit, the family-service worker averred that since the November 2016 protective-services case was opened, the home remained cluttered, the children continued to miss school, and the children were not assessed for mental-health services. The circuit court entered an ex parte order of emergency custody on April 12. On May 4, the circuit court held a probable-cause hearing, and it found that probable cause existed for the children to remain in the Department's custody.

On June 5, 2017, the circuit court held an adjudication hearing, and the parties stipulated to a finding the children were dependent-neglected due to environmental neglect. The circuit court established a goal of reunification. Boomhower and Hosier were ordered to comply with the standard welfare orders of the Department and to follow the psychological-evaluation recommendations.

At a subsequent review hearing, the court found that both Boomhower and Hosier had partially complied with the case plan, and the goal of the case continue to be reunification. At a permanency-planning hearing held on March 16, 2018, the court changed the goal of the case to adoption with a concurrent goal of permanent relative placement. The court did not make a finding regarding Boomhower's or Hosier's compliance. The court conducted a fifteen-month review hearing on June 25, and set

2

concurrent goals of reunification and termination of parental rights/adoption. Again, the court made no compliance finding as to the parents.

On August 31, 2018, the Department filed a petition to terminate the parental rights of both parents on the basis of the following grounds: (1) twelve month failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*) (Supp. 2017), (2) subsequent factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*), and (3) aggravated circumstances—little likelihood of successful reunification despite a reasonable offer of services (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*). The petition also alleged that termination was in the children's best interest.

At the termination hearing on October 1, 2018, Stephanie Meeker, the program assistant assigned to the case through the Division of Children and Family Services, testified about her most recent visit to the home. Meeker explained that she was not immediately allowed into the home because Boomhower told her Hosier had stuff out that was not safe to be around. Boomhower eventually let Meeker into the home and told her it was some of Hosier's swords. When asked about the clutter that day, Meeker described it as "some trash underneath the bed, there was stuff kind of sitting everywhere." She went on to explain that "they have a lot of stuff and not a whole lot of places to put it." The children's rooms had an odor to them, and she noticed specks on the bathroom floor and opined that they were possibly feces. Meeker noted two other spots in the home with feces on the floor. She also mentioned that the floor was wet from Hosier having just mopped.

Meeker then described her other visits in the home. She explained that when Boomhower and Hosier moved into their new apartment from their mobile home, they

3

had a couple of unsupervised visits. However, those visits stopped when the home was very dirty one day: there were dog feces all over the bathroom and dining room floors, and the home had a really strong odor of feces and urine. Meeker testified that she provided them with cleaning supplies, personal-hygiene products, and even fixed the underpinning on their mobile home so the dogs could go outside instead of urinating in the home. Meeker testified that whenever she arrives for a visit, she must wait anywhere from two minutes to ten minutes before she is allowed inside, and the floor is usually wet from having been mopped. Meeker acknowledged that when people have pets, it is reasonable to expect that sometimes they are going to chew up toys or other things. She also testified that Boomhower and Hosier lacked stable housing—they had lived in three homes since the case opened—and lacked stable income. Lastly, Meeker said she felt nauseated every time she interreacted with the family between transporting them and going to their house and that she had vomited on multiple occasions.

Sarah Speight, the family service worker since December 18, 2017, testified that the home was not clean on any of her visits. Speight's testimony mirrored Meeker's. When asked about the clutter, Speight added that on one visit, Boomhower and Hosier had a rabbit on the loose and there were dirty dishes with bugs on them. Speight could not say they were getting better at cleaning. She aided them in making a detailed schedule to help them stay on track with cleaning. Like Meeker, Speight also discussed their income and housing instability. She believed the children were adoptable and she described BH's current need to be in a therapeutic home, but she did not think his issues were something that would bar his adoption. Speight explained that the family moved in June to an apartment

from their mobile home, and they were able to have an unsupervised visit in June, but by August 3, the home was no longer appropriate. She explained there were not any July visits because the parents did not confirm with the Department that they would be there. Unlike Meeker, Speight never got sick. Lastly, she opined it would be harmful to return the children to Boomhower and Hosier because despite having eighteen months to remedy their situation, they had not, and the children's needs would continue to not be met. She admitted the parents had made a little progress, but that things could easily go back to where they were, if not worse.

Boomhower testified that at the most recent home visit, she could not immediately let Meeker in because "Mark had his gun case open. He was cleaning out his sword. He was going to finish and put it away when he got back from going downtown. He had some stuff to do down there with his father." When asked why she could not invite Meeker in to explain that, she said, "We have before and it counted against us." Boomhower testified that the dogs would get urinary-tract infections, but she would take them to the veterinarian, and whenever they would urinate on the floor she would clean it up right away. She also denied that the home had a foul odor. She denied making Meeker wait and said if she did ever have to wait it was because Boomhower was in the bathroom. Boomhower testified that during the pendency of the case they were able to make it work financially because there had not been a time where she or her husband went hungry or failed to pay rent; they never had their utilities cut off; and they always paid their veterinary bill. She said the attic crawl space is located in the kids' room and that must be where the foul odor was coming from. Boomhower said they are down to two dogs from twenty-two dogs, a rabbit, and a

cat, and that she has gotten rid of a bunch of stuff to cut down on the clutter. She testified that she did not think she and her husband could have done any better on maintaining their recent cleanliness. Lastly, she introduced pictures of how the house had been and what it looked like two days before the hearing.

Hosier testified that the Department would sometimes arrive around 8:00 a.m., which was very early for him, so he asked them to wait outside on occasion while he put a shirt on. He said that there would be dog feces and urine on the ground because the dogs could not hold it through the night. He estimated that he would have to clean up dog messes in the morning once or twice a week. He said Boomhower was not currently working but that he makes enough money to support his home so that she did not have to work. He was not aware of an odor in the home.

Following the termination hearing, the circuit court entered an order terminating both Boomhower's and Hosier's parental rights on the basis of all three grounds alleged in the Department's petition and on the basis of the court's best-interest finding, including its consideration of the adoptability of the children and the potential harm if they were returned to the parents' care. Boomhower and Hosier both appeal the circuit court's order terminating their parental rights.

We review termination-of-parental-rights cases de novo. *Heath v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 255, at 5–6, 576 S.W.3d 86, 88–89. We review for clear error, and a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id*. A court may order termination of parental rights if it finds clear

and convincing evidence to support one or more statutory grounds listed in the Juvenile Code, Ark. Code Ann. § 9-27-341(b)(3)(B), and that termination is in the best interest of the child, taking into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by returning him or her to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A).

## II. *Statutory Grounds*

Proof of only one statutory ground is sufficient to terminate parental rights. *Corley v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 397, at 4–5, 556 S.W.3d 538, 541–42. The failure-to-remedy ground, codified at Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* & *(b)*, provides that termination is appropriate when a juvenile has (1) been adjudicated by the court to be dependent–neglected and (2) continued to be out of the custody of the parent or the home of the noncustodial parent for twelve months and, (3) despite a meaningful effort by the Department to rehabilitate the parent and correct the conditions that either caused removal from the custodial parent or prohibited placement with the noncustodial parent, the conditions have not been remedied.

At the end of the termination hearing, the circuit court found that it had no confidence that more time or more services would make a difference in remedying the environmental neglect that opened up the case in the first place. The court specifically found Boomhower not credible. Regarding the pictures Boomhower introduced, it stated, "The Court had a question prior to seeing those pictures about whether there was an incapacity, an ability, an incapacity [*sic*]. At least today, I know they know how it should look." The court stated,

7

And the fact that these kids are not at risk of picking up dog feces and eating it does not mean that they're not at risk for living in a home where dog feces and urine are present and control the smell of the premises so much to the point that the smell perhaps goes with the parents when they leave the home. Children don't have to live in that. Children ought not to have to live in that.

On appeal, Boomhower and Hosier argue that sufficient evidence does not support the circuit court's finding that they failed to remedy the conditions that caused removal. They both direct us to testimony that favors them and essentially ask us to reweigh the evidence in their favor, which we will not do because credibility determinations are for the circuit court to make, not this court. *Arnold v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 300, at 9–10, 578 S.W.3d 329, 335.

The condition that caused removal of the children was environmental neglect. At the time of removal, the home was described as "cluttered with trash, dog feces, animal urine, and dirty clothes." At the time of the termination hearing, the home was still being described as cluttered, and Meeker testified that as recently as two weeks before the termination hearing she noted dog feces during her visit. While the parents testified that they had taken great strides to eliminate clutter and had even bought new furniture since the last home inspection, this court has repeatedly held that the children's "need for permanency and stability will override [a parent's] eleventh-hour efforts." *Gonzalez v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 425, at 11, 555 S.W.3d 915, 921.

This case was open for a total of eighteen months, and that does not include the Department's involvement with the family before the emergency hold was taken on the children. During the entirety of the case, Boomhower and Hosier never progressed to a point where they could have a trial placement. While issues like dirty dishes or feces may

8

not be individually dangerous, the entire environment taken together is unhealthy for children. Considering all the evidence, the circuit court did not clearly err.

Boomhower additionally argues that the Department failed to prove that it engaged in a meaningful effort to rehabilitate the family from the time of the review hearing in March. Boomhower asserts that the Department offered basic services, but it did not engage in a meaningful effort to rehabilitate the family as required by statute. We disagree and think there is sufficient evidence to support a meaningful-efforts finding. Meeker and Speight both testified about giving the parents cleaning and personal-hygiene supplies, providing transportation, and remedying issues with the parents' mobile home so the dogs could make an easier exit to use the bathroom. Speight also testified to working with Boomhower and Hosier on a cleaning schedule and offering to help clean. Despite these efforts, the parents never got better at cleaning per Speight's testimony. Notably, Boomhower fails to indicate what services could have prompted her to maintain a clean environment. *See Martin v. Ark. Dep't of Human Servs.*, 2017 Ark. 115, 515 S.W.3d 599 (affirming where appellant did not indicate which particular services the Department could have offered him that would have prevented him from choosing his children's abuser over his children).

Because only one statutory ground must be proved to support termination of parental rights, we need not address the other statutory grounds found by the circuit court. Ark. Code Ann. § 9-27-341(b)(3)(B).

III. *Best Interest*

In making a "best-interest" determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential harm to

9

the child if custody is returned to a parent. *Miller v. Ark. Dep't of Humans Servs.*, 2016 Ark. App. 239, 492 S.W.3d 113.

Boomhower challenges the circuit court's adoptability finding. While the likelihood of adoption must be considered by the circuit court, that factor is not required to be established by clear and convincing evidence. *Stanley v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 581, at 6–7, 507 S.W.3d 544, 549. The circuit court "must simply consider the likelihood that the children will be adopted—that factor need not, however, be established by clear and convincing evidence." *Id.* Here, Meeker testified that the children were adoptable. A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *Id.*

Regarding the potential-harm factor, both Boomhower and Hosier dispute the court's findings. In assessing this factor, the circuit court is not required to find that actual harm would ensue if the child were returned to the parent or to affirmatively identify a potential harm. *James v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 445, at 15, 562 S.W.3d 218, 226. The potential-harm analysis is to be conducted in broad terms. *Id.* Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *Id.*

The evidence before the circuit court established that Boomhower and Hosier, despite eighteen months of services from the Department, were never able to keep their home clean on a consistent basis. While maintaining a clean house may not seem like much, it is the significant issue in this case because the parents' environmental neglect was the primary risk to the children's health, safety, and welfare, which caused the Department to

10

get involved. The overall neglect of the home throughout much of the case is a logical predictor of likely potential harm to the children should they be returned to Boomhower's and Hosier's care.

Accordingly, we cannot say that the circuit court clearly erred in terminating Boomhower's and Hosier's parental rights.

Affirmed.

GRUBER, C.J., and HARRISON, J., agree.

*Tina Bowers Lee*, Arkansas Public Defender Commission, for appellant Amber Boomhower.

*Katalina Wyninger*, for appellant Mark Hosier.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.